## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 1:10-cr-00456-REB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     LOUIS CONSTANTINE HAMPERS,
          a/k/a Mark Hampton,
          a/k/a Marc O'Hara,
          a/k/a Carl O'Hanlon,
          a/k/a Lou Gray,
          a/k/a Louis Gray,

      Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Gregory A.

Holloway, Assistant United States Attorney for the District of Colorado, and the

defendant, LOUIS CONSTANTINE HAMPERS, a/k/a Mark Hampton, a/k/a Marc

O'Hara, a/k/a Carl O'Hanlon, a/k/a Lou Gray, a/k/a Louis Gray, personally and by and

through counsel, Craig A. Gillen and Richard Tegtmeier, submit the following Plea

Agreement and Statement of Facts Relevant to Sentencing, pursuant to D.C.Colo.LCrR

11.1.

Court's Exhibit

**1**

## I. **PLEA AGREEMENT**

The defendant agrees to plead guilty to Counts 2, 3; 62, 63; 144, 145; 188, 189; 311, 312; 397, 398; 491 and 492 in the Indictment charging him with Obtaining and Acquiring a Controlled Substance by Fraud and Deceit.

The government agrees that a two-point reduction in the offense level for acceptance of responsibility is appropriate pursuant to United States Sentencing Commission, Guidelines Manual, § 3E1.1(a).

As part of this plea agreement, the government agrees to dismiss all of the remaining Counts in the Indictment at the time of sentencing. The government also agrees not to charge the defendant in the Federal District Court for the District of Colorado for any other potential criminal offenses currently known to the government.

As part of this plea agreement, the defendant agrees to relinquish and not seek reinstatement of any license to practice medicine in Colorado or any other State and/or District in the United States during the period of supervised release. Additionally, the defendant agrees to relinquish and not seek reinstatement of any privileges to prescribe controlled substances during the period of supervised release. The defendant agrees that as a condition of supervised release, he is not to initiate any contact with The Children's Hospital Colorado and its employees or staff; and, the defendant is not to initiate any contact with D. S., a/k/a D. M., and/or her child.

2

## II. ELEMENTS OF THE OFFENSES

**For all Counts of Conviction (2, 3; 62, 63; 144, 145; 188, 189; 311, 312; 397, 398; 491 and 492):**

In order to establish a violation of 21 U.S.C. §§ 843(a)(3) and (d)(1) as charged in Counts 2, 3; 62, 63; 144, 145; 188, 189; 311, 312; 397, 398; 491 and 492, the government would need to prove that for each count:

a) The defendant did knowingly obtain a controlled substance, specifically Hydrocodone 5/500 mg; and

b) the defendant did so by misrepresentation, fraud, deception or subterfuge.

## III. STATUTORY PENALTIES

**For all Counts:**

The statutory penalties for a violation of 21 U.S.C. §§ 843(a)(3) and (d)(1) are not more than 4 years imprisonment; not more than a $250,000 fine, or both; not more than 3 years supervised release; and $100.00 special assessment fee on each count.

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

A violation of the conditions of probation or supervised release may result in a separate prison sentence.

## IV. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements which establish a factual basis of the offense of conviction.

Pertinent facts are set out below in order to provide a factual basis for the plea and to provide facts which the parties believe are relevant, pursuant to § 1B1.3, for computing the appropriate guideline range.  To the extent the parties disagree about the facts relevant to sentencing, the statement of facts identifies which facts are known to be in dispute at the time of the plea.  (§ 6B1.4(b))

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein which are relevant to the advisory guideline computation (§ 1B1.3) or to sentencing in general (§ 1B1.4).  Nor is the Court or Probation precluded from the consideration of such facts. In "determining the factual basis for the sentence, the Court will consider the stipulation [of the parties], together with the results of the pre-sentence investigation, and any other relevant information."  (§ 6B1.4 Comm.)

The parties agree that the government's evidence would show that the date on which the conduct relevant to the offense (§ 1B1.3) began is April of 2010.  The conduct occurred in the State and District of Colorado.  The parties agree that the government's evidence would be as follows:

1.      In April of 2010, the DEA was contacted by a confidential source ("CS-1").  CS-1

4

is a person known to the defendant, Dr. Louis Hampers. Hampers was the head emergency room physician for The Children's Hospital in Aurora, Colorado. CS-1 had been seeing the defendant since approximately the end of 2008/early 2009 to April of 2010.

2.      CS-1 contacted the DEA because on April 3, 2010, Hampers sent her a text from his cell phone asking that CS-1 call him. When CS-1 responded to Hampers, he told CS-1 he had been illegally filling Hydrocodone prescriptions for himself using CS-1's son's name and a fake identity. Hampers needed to talk to CS-1 because he left his fake driver's license at a Denver area Walgreens while trying to fill a prescription in the name of CS-1's son. CS-1 asked Hampers via text how many times and what names Hampers was using. Hampers responded by text stating "Several Times a month–all 3 ur [sic] names. Different pharmacies."

3.      Investigators checked the Prescription Drug Monitoring Program ("PDMP") database for prescriptions written by Hampers to CS-1 and CS-1's two minor children. There were over 150 scripts written by Hampers filled at Denver area pharmacies for CS-1 and CS-1's children. (CS-1 and the two minor children live in Colorado Springs.) The April 3, 2010 prescription in the name of CS-1's son was at a Denver area Walgreens.

4.      Agents went to the Walgreens where Hampers had left his fake driver's license on

April 3, 2010.  The pharmacy manager explained that she noticed a large number of refills

for hydrocodone prescriptions were being written by the same emergency room physician

to CS-1's son.  Finding this strange, the manager noted in the Walgreens records system to

have anyone picking up a prescription for CS-1's son present identification.  When

Hampers attempted to pick up the prescription for CS-1's son, the pharmacy tech asked

for identification.  Hampers gave a driver's license in the name of Mark Hampton.  After

a few minutes, Hampers got nervous and left the drive through before he received the

prescription.  Hampers left the fake identification behind.


5.      The Walgreens manager recognized Hampers as having previously picked up a

prescription for CS-1's son.  She obtained the store's surveillance video from March 17,

2010, which shows Hampers picking up a prescription for CS-1's son.


6.      In examining the license in the name of Mark Hampton, agents discovered that the

photo is the same photo as the one on Hampers' own legitimate Colorado driver's license.

A records check of the name Mark Hampton shows no record of a Mark Hampton in

Colorado.

7.      In the Walgreens record system, the phone number listed for Mark Hampton is the same phone number as that listed to Dr. Hampers.  Walgreens records also show this same phone number given as the contact number for prescriptions filled for Hampers, the name Mark Hampton and two other names: Carl O'Hanlon and Marc O'Hara.

8.      A review of records for prescriptions written to Mark Hampton, Carl O'Hanlon and Marc O'Hara show them all written by Hampers.  Investigators also found prescriptions written by Hampers to the names Lou Gray and Louis Gray.  The birth dates to all of these names show dates of birth in the 1960's.  All of the names have no record as persons in Colorado.

9.      All three of these identities had multiple prescriptions filled at different pharmacies throughout the Denver metro area, claiming home addresses in the Denver metro area as well.  Records from these pharmacies show the same illegible signature given for each of these prescriptions as they were picked up.  A photo line up was prepared with Hampers' photo.  Witnesses at various pharmacies independently identified Hampers as the person they knew as Mark Hampton, Marc O'Hara and Carl O'Hanlon. In all, 654 prescriptions, totaling 19,006 tablets, were written by Hampers to these three aliases as well as in the names of CS-1 and CS-1's children.

7

10.     A records check at Children's Hospital shows that none of these names are patients at Children's Hospital – with no medical records underlying the prescriptions as required by law.  The defendant did not provide any medical services or did not see any patients in any institution other than the Children's Hospital ER.

11.     On August 13, 2010, Hampers met with CS-1.  This meeting was recorded by the DEA on video.  The defendant explained to CS-1 that he had been illegally obtaining controlled substances, including Hydrocodone (Vicodin), using seven different names. Hampers admitted that in addition to using the identities of CS-1 (named as J.L.) and her two children (A.B. and K.B.), he used four separate aliases.  Hampers explained to CS-1 that he had an elaborate routine filling scripts nearly every day and rotating pharmacies. Hampers said he never sold or dealt the drugs, keeping them all for himself.  Hampers told CS-1 that in looking at the database [the PDMP], he guessed that he had fraudulently filled over a thousand scripts.

## V.  SENTENCING COMPUTATION

The parties understand that the court may impose any sentence, up to the statutory maximum, regardless of any guideline range computed, and that the court is not bound by any position of the parties.  (§ 6B1.4(d))  The court is free, pursuant to §§ 6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties'

8

stipulations, the pre-sentence investigation, and any other relevant information.   (§ 6B1.4 Comm.; § 1B1.4)

To the extent the parties disagree about the sentencing factors, the computations below identify the factors which are in dispute.   (§ 6B1.4(b)).

A.      The base guideline for Counts 2, 3; 62, 63; 144, 145; 188, 189; 311, 312; 397, 398; 491 and 492 is § 2D2.2, with a base offense level of 8.

B.      The following specific offense characteristic applies:

1.      There is a 2 level increase pursuant to § 3B1.3 because the offense involved the abuse of a position of trust or use of a special skill.

C.      There are no victim related or role in offense related adjustments.  Pursuant to § 3D1.2(d), the offenses are excluded from grouping.  Accordingly, pursuant to § 3D1.4 there are more than 5 units resulting in a 5 level increase.  The parties agree that they believe no adjustments other than those listed above apply.

D.      The adjusted offense level would therefore be 15.

E.      The defendant should receive a 2 level adjustment for acceptance of responsibility.  The resulting offense level would therefore be 13.

F.      The defendant will seek a downward departure bases upon § 5H1.3 and § 5H1.4.  The defendant will also seek a downward variance pursuant to the factors set forth in 18 U.S.C. § 3553(a).  The government reserves the right to either join or oppose

such requests. In the event that the government does not join in the defendant's requests for any downward departure or a variant sentence, the government's recommendation will be within the guideline range resulting from the calculated guideline score of 13.

G.      The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court. Known facts regarding the applicable criminal history are as follows:

1. The defendant has no known criminal history.

Based on that information, if no other information were discovered, the defendant's criminal history category would be I.

H.      Assuming the (tentative) criminal history facts of (F) above, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

I.      The guideline range resulting from the estimated offense level of 13 above, and the (tentative) criminal history category of I above, is 12-18 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level 13 above could conceivably result in a range from 12 months (bottom of Category I), to 41 months (top of Category VI). Should the guideline range fall within Zone C, the government agrees not to oppose a defense request for a sentence pursuant to § 5C1.1(d)(2).

J.      Pursuant to guideline § 5E1.2, assuming the estimated offense level of

above, the fine range for this offense would be $3,000 to $30,000, plus applicable interest and penalties.

K.    Pursuant to guideline § 5D1.2, if the Court imposes the term of supervised release, that term shall be not more than 3 years.

## VI. WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE

The parties believe the proposed plea agreement is appropriate because all relevant conduct is disclosed, the sentencing guidelines take into account all pertinent sentencing factors with respect to this defendant, and the charges to which the defendant has agreed to plead guilty adequately reflect the seriousness of the actual offense behavior.

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 7/13/11            _____
                         LOUIS CONSTANTINE HAMPERS
                         Defendant

Date: _____    _____
                         CRAIG A. GILLEN
                         Attorney for Defendant

11

Date: 7-13- 11

_____
RICHARD TEGTMEIER
Attorney for Defendant

Date: 7.13.2011

_____
GREGORY A. HOLLOWAY, WSBA #28743
Assistant U.S. Attorney