```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
   Criminal Action No. 10-CR-00456-REB
 3
   UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
   vs.
 6
   LOUIS CONSTANTINE HAMPERS,
 7
        Defendant.
 8  _____

 9                   REPORTER'S TRANSCRIPT
                        Sentencing
10  _____

11         Proceedings before the HONORABLE ROBERT E. BLACKBURN,

12  Judge, United States District Court for the District of

13  Colorado, commencing at 10:02 a.m., on the 28th day of March,

14  2012, in Courtroom A1001, United States Courthouse, Denver,

15  Colorado.

16

17

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 893-2835
```

1              APPEARANCES

2        Gregory Allen Holloway, U.S. Attorney's Office,

3  1225 17th Street East, Suite 700, Denver, CO 80202, appearing

4  for the plaintiff.

5        Craig Allen Gillen of Gillen Withers & Lake, LLC,

6  3490 Piedmont Road, N.E., Suite #1050, Atlanta, GA 30305;

7        Richard L. Tegtmeier of Sherman & Howard, LLC,

8  90 South Cascade Avenue, Suite #1500, Colorado Springs, CO

9  80903, appearing for the defendant.

10

11             PROCEEDINGS

12        *THE COURT:*  This is 10-CR-456 identified for our

13  purposes this morning as United States of America v. Louis

14  Constantine Hampers, defendant.  The matter comes on before

15  this Court set for sentencing.

16        Commencing with the government and transitioning to

17  the defense, gentlemen, may I have your appearances, please.

18        *MR. HOLLOWAY:*  Good morning, Your Honor.  Greg

19  Holloway, Assistant United States Attorney on behalf of the

20  United States of America.

21        *THE COURT:*  Good morning.

22        *MR. GILLEN:*  Good morning, Your Honor.  Craig Gillen

23  and Richard Tegtmeier on behalf of Dr. Hampers.

24        *THE COURT:*  Good morning.  And I note that Dr. Hampers

25  is present in person.  Also importantly and relevantly, at

1    least to the Court, Probation Officer Kurt Thoene is present.

2    Good morning.

3              *PROBATION OFFICER:*  Good morning, Your Honor.

4              *THE COURT:*  Assuming we are prepared to proceed to

5    sentencing as stated and understood by the Court, I first find

6    and conclude relevantly that as required by 18 U.S.C. 3552 and

7    Federal Rules of Criminal Procedure 32, the probation

8    department has conducted a presentence investigation and has

9    filed a presentence report replete with an addendum and several

10   exhibits.  For the record, I have received, read and reviewed

11   hopefully carefully the presentence report and its concomitant

12   addendum and exhibits.

13             Has the government, Mr. Holloway?

14             *MR. HOLLOWAY:*  I have, Your Honor.

15             *THE COURT:*  Are there any additions or corrections of

16   a material or a substantive nature not now of record?

17             *MR. HOLLOWAY:*  No, Your Honor.

18             *THE COURT:*  A series of questions to counsel for

19   Dr. Hampers:  First, counsel, have you read the presentence

20   report, its addendum and its exhibits?  Second, to your

21   knowledge, has Dr. Hampers done likewise?  And third, and

22   certainly most importantly, have you reviewed and discussed the

23   presentence report, its addendum and exhibits carefully and

24   thoroughly with Dr. Hampers?

25             *MR. GILLEN:*  Yes, Your Honor, we have.

1          THE COURT:  From the perspective of the defense, are

2     there any additions or corrections of a material or substantive

3     nature not now of record?

4          MR. GILLEN:  Not other than contained within our

5     objections, Your Honor.

6          THE COURT:  Now, counsel before I receive your

7     anticipated sentencing statement, please understand that I have

8     received, read and reviewed carefully all facts presented,

9     reasons stated, arguments advanced and authorities cited by you

10    in your presentencing papers and, frankly, the other media

11    which has been provided to me.  Therefore, during this hearing

12    please provide me with something more than a festooned and

13    soporific reiteration of that which is already written or

14    broadcast.

15          Very well.  With that important introduction, I turn

16    to counsel for Dr. Hampers to inquire as I must as follows:

17          Gentlemen, do you wish to make a statement on behalf

18    of Dr. Hampers, offer additional information in mitigation of

19    sentencing, comment further on the various determinations and

20    recommendations of the probation officer and be heard on

21    matters relating to the appropriate sentences?

22          MR. GILLEN:  Yes, Your Honor, we do.  We would

23    anticipate, if the Court were to engage briefly in some

24    allocution regarding the guideline departure, we also have two

25    individuals who we would ask to speak to the Court who did

1   provide information to the Court on the DVD, as well as in the

2   letters, to perhaps enunciate some of the points they made in

3   that material and in addition to allocute as to the 3553(a)

4   factors.

5           THE COURT:  This is your opportunity to be heard on

6   all of those matters.  You are going to have to convince me I

7   should hear further from people who have already contributed to

8   the sentencing papers and media which you have presented me and

9   which I have read and reviewed.  By quick offer of proof,

10  what's new?

11          MR. GILLEN:  Well, Your Honor, I would say that

12  perhaps it would be nothing "new," but to stress and to

13  emphasize points made by the various professionals in somewhat

14  of a complicated area in terms of mental health treatment.  But

15  if the Court -- we are here to provide the Court the

16  information necessary for the Court to make the determination.

17  I am not here to burden the Court with unnecessary allocution,

18  so if the Court is not inclined to hear from those individuals.

19          I will state for the record we do have Dr. Ritvo, I

20  believe Dr. Ritvo has arrived here, who has appeared on the

21  DVD, has written a letter to the Court and would be prepared to

22  answer any questions that would be propounded by the Court if

23  the Court had questions about any of the conclusions that he

24  proposed to the Court or recommendations that he made to the

25  Court regarding an appropriate sentence for Dr. Hampers.

1          In addition, we also have Ms. DeVonna Anthony who has

2   been involved in the mental health treatment of Dr. Hampers.

3   She also has prepared a letter to the Court and has also

4   appeared on the DVD.  We are not here to reiterate or

5   regurgitate what they have said, but if the Court has any

6   additional questions about their recommendations or comments,

7   then they are here for the Court to answer those questions.  If

8   the Court does not, given the Court's inclination not to have

9   anything repeated, then I would submit that they are here, but

10  I don't want to burden the Court with additional time consuming

11  matters such as their emphasis on the points they made.

12          *THE COURT:*  Well, given the presentations that they

13  have already made to the Court and without sounding immodest, I

14  get it.  So to the extent that I am flummoxed, I can assure you

15  that additional information by them today at the hour of

16  sentencing would benefit me little; and therefore, they may

17  remain as your advisors, but not as advisors for the Court.

18  And with that, you may proceed.

19          *MR. GILLEN:*  Thank you, Your Honor.

20          If I may, what I would propose doing is, as counsel,

21  make various points regarding our positions and analysis of the

22  guidelines and the 3553(a), and then, of course, ask

23  Dr. Hampers to speak.

24          *THE COURT:*  I will give him that opportunity.

25          *MR. GILLEN:*  Thank you, Your Honor.

1          Your Honor, the first phase is the -- it seems to the

2     defense that we need to address the issues regarding the

3     guidelines.  It is all agreed by both parties that we begin at

4     level 13.  And beginning at level 13 from the defense's

5     perspective should not be the ending as it applies to the

6     Court's analysis of what guideline range we should end up in

7     prior to the Court's application of the 3553 factors.

8          What we have presented in both our objections to the

9     presentence report and in our motion for a downward departure

10    or a downward variance is our analysis under 5H1.3, and we

11    believe that that guideline was amended in 2010 to liberalize

12    the Court's ability to utilize that section for a downward

13    departure within the guideline range.

14         The Commission stated that now mental and emotional

15    conditions may be relevant in determining whether a departure

16    is appropriate and may use -- in the critical analysis under

17    this section and may use as appropriate the specific treatment

18    purpose under 5C1.1, Application Note 6.  That section also is

19    mentioned in 5H1.4, which is the physical condition or

20    appearance, or a drug or alcohol dependence.

21         It acknowledges to the Court that even under the

22    amendments in 2010, the drug and alcohol dependence or abuse

23    ordinarily is not a reason for downward departure.  Our view is

24    coupled together with the mental and emotional conditions that

25    the perfect -- we believe the appropriate and the most relevant

1    section would be the Application Note 6.

2         When you look at Application Note 6 under 5C1.1, it

3    seems to apply very, very directly to this case.  Whether there

4    would be a departure out of Zone C, which we are presently in

5    at level 13, when we take a look at what we have, the defendant

6    must be an abuser of narcotics or other controlled substances

7    or suffer from a significant mental illness, which is the case

8    that we have here with Dr. Hampers in terms of the

9    well-documented material that the Court has received regarding

10   his mental health issues and also his abuse of controlled

11   substances, and the defendant's criminality is related to the

12   treatment problem to be addressed.

13        And we think, of course, this is about Dr. Hampers

14   using and falsely using the prescription power that he had to

15   obtain Vicodin for himself to feed his habit.  And the

16   treatment program that is advocated by the defense through the

17   recommendations of Dr. Ritvo would address specifically the

18   very crime that he committed and the treatment would be

19   specifically addressed to that problem.

20        And additionally, Application Note 6 states that the

21   Court must determine whether the likelihood that the completion

22   of the treatment program would successfully address the

23   treatment problem thereby reducing the risk to the public.  Our

24   view is that the better and the healthier that we can make

25   Dr. Hampers, not only is that good for Dr. Hampers, but it is

1    also good for the community as a whole because it eliminates

2    the risk that he may ultimately pose to the community.

3         Further, under Note 6 it states that the determination

4    of whether imposition of less imprisonment than required by

5    Zone C would increase the risk of the public from further

6    crimes by the defendant.  Again, that is not the case because

7    the treatment program would reduce, not increase the risk of

8    further crimes by the defendant.  And so we would ask the Court

9    to consider utilizing that 5H1.3 and Application Note 6 for the

10   downward departure to get the appropriate treatment.

11        The government in its response to the defense motion

12   for a downward departure or variance stated that it believed

13   that the appropriate guideline was not 5H1.3, but 5K2.13

14   dealing with diminished capacity.  In our response, we stated

15   that when you look at 5K2.13, it is inapposite here.  That has

16   to do with the departures.  The chapter we are dealing with

17   under the section advocated by the defense has to do with

18   specific offender characteristics.  And those specific offender

19   characteristics are precisely the characteristics which we

20   would believe and advocate would be appropriate in this case.

21        And so we would ask the Court not to follow the

22   government's position regarding diminished capacity, but rather

23   utilize the vehicle that has been advocated by the defense for

24   a downward departure.  Now, that has to do obviously with the

25   guidelines.

1          Now, as it relates to the guidelines, the Court makes

2    the determination about what level you believe it is

3    appropriate within the guidelines and then we move to the 3553

4    factors.  I would like to briefly allocute as to the defense's

5    position on the 3553(a) factors.

6          This case under 3553 that the defendant's

7    characteristics and his history as an individual can now be

8    considered, as the Court is well aware, where it couldn't

9    before, and this is a classic case why it really should matter.

10   The life and the contributions that Dr. Hampers has contributed

11   does matter in a sentencing in federal court now in the age

12   when it didn't in a pre-Booker situation very much at all.

13         What he has done, you know, the Court sees a lot of

14   folks that you sentence and must pass sentence upon those

15   individuals.  A lot of folks, when they get in trouble, that's

16   when they begin to think that they need to start doing good

17   things for other people.  That's when they decide that they

18   need to get more involved in the church or they need to do

19   things that will reflect well upon them in front of the court.

20   It's not the case with Dr. Hampers.

21         Well, before Dr. Hampers ever got in trouble he was

22   giving of himself to the community and to the world as a whole.

23   The Court is very much aware of his hard work in school, his

24   academic prowess.  But then he goes to Kenya -- not every

25   doctor does that -- and live for a year under the conditions

1    that he lived under and performed the services that he

2    performed there, be it sewing somebody's finger or arm back on

3    or hand back on or trying to do C-sections or doing what was

4    necessary with a enormous pressure put upon him as a physician.

5    He was giving back.

6            When he came back to the United States, he didn't stop

7    giving.  And when he went to Chicago, he understood that there

8    was a problem with individuals with language barriers when they

9    came into emergency rooms.  And he then began working on that

10   problem and wrote and published extensively on that and was one

11   of the leaders prior to his problem which is self-inflicted.

12           We are not here to blame anybody for Dr. Hampers'

13   reasons for being in this courtroom other than Dr. Hampers, but

14   we also realize that during that period of time he was out

15   trying to figure out how he could help underprivileged

16   communities, underserved communities who did not have English

17   as their -- and able to communicate with emergency rooms.  He

18   did a phenomenal job there.  He continued with that.  Even when

19   he came to Colorado, he was active in that process as well.

20           He has been a giver of himself back to the community

21   well before he got in trouble.  It should we believe speak

22   highly to his life and to the shadow that he has cast upon the

23   community in a good sense, not just the bad sense that he has

24   done which has caused him to be here.

25           Another issue quickly on the issue of addiction.  We

 1   have seen a lot of information going back and forth concerning

 2   the issue of addiction.  We need to be clear about this point.

 3   The defense is not saying -- and there might be some confusion

 4   about that.  I want to clear this up.  We are not saying to the

 5   Court or to anyone else that Dr. Hampers, once he got Vicodin

 6   to handle some injury, hockey injury, that he suddenly and

 7   magically was then hooked on Vicodin and therefore he shouldn't

 8   be responsible for any of his conduct.  That's not our

 9   position.

10        Our position is established by folks who do this for a

11   living and who have knowledge of tens of thousands of cases.

12   Ms. Anthony was to say today and explain the invisible line in

13   one's brain that if you choose to take a drug, which he chose

14   to take illegally at that point, there comes a point where that

15   decision no longer becomes a decision of yours, that you have

16   crossed that line in your mind and you become addicted.  It's

17   that addiction at that point that we have focused on in terms

18   of what the appropriate sentence would be, not whether he is

19   guilty or innocent of the charges, but what the sentence should

20   be.

21        So our view is the Court has seen there is a genetic

22   vulnerability for Dr. Hampers in terms of addiction issues.

23   That coupled with the mental health issues has created a

24   situation where that dual diagnosis is difficult to initially

25   diagnose and it is difficult to treat, but it can be treated.

1          So the point about -- and the point about addiction

2    becomes important because in the presentence report the

3    presentence report focuses largely on how to distinguish

4    between Dr. Hampers' case and others, whereas we have seen from

5    the studies that have been analyzed by the probation office and

6    by the defense that there is a -- I think even cited by the

7    probation -- two-thirds of those folks receive probation.

8          But the distinction drawn by the probation office is,

9    well, this case is unique and atypical because it has so many

10   Vicodin violations in it.  Our position to the Court is that's

11   not atypical.  It's not unique.  It is a well-known fact within

12   the addiction treatment community that that sort of volume is

13   not atypical viewed by people who counsel and who treat

14   addiction.  Dr. Gundersen and Ms. Anthony have spoken to that

15   on the DVD and Ms. Anthony in a letter to the Court.

16         But what becomes important here is that it appears

17   that his case is atypical because in August of 2007 Colorado

18   began a program where electronically it's easier, where it's

19   extremely easy to follow prescriptions written by a particular

20   doctor.  And so prior to that you really couldn't tell if a

21   physician was abusing Vicodin to the extent that Dr. Hampers

22   was because you could not -- there would be no way of finding

23   the paper trail of all of the prescriptions that had been

24   written that were fraudulent and had been used by the doctor.

25         It's easy to do it after 2007.  You press the button

1   and all of these violations came to the front so that -- so as

2   in our pleadings we have said that shows you should really not,

3   we would submit, compare the pre '07 period with his case and

4   it's, in fact, not unique.

5        We also addressed the issue of whether or not

6   deterrence requires that he be sent to jail to send a message

7   to other physicians.  Our point, Your Honor, of course, is

8   based upon the counseling from Dr. Gundersen and from

9   Ms. Anthony, that physicians in active addiction, physicians

10  who are in active addiction are not going to be deterred by

11  anything else.  They are driven by that addiction to the point

12  that they are going to do what's necessary to obtain the drug

13  that has taken over their lives and become the monster inside

14  their body.  And so we believe that deterrence necessarily

15  would not be served.

16       The additional issue which was raised in the

17  presentence report extensively and comprised a great deal of

18  our analysis of the similar cases, because as the Court is

19  aware, part of the component of the 3553 analysis deals with

20  whether the -- you know, how the treatment or the sentence of

21  Dr. Hampers should not be divergent necessarily from similarly

22  situated cases.

23       Even the initial analysis by the probation office

24  rendered an opinion, and I think two to one was the probation

25  sentence, but it was even more compelling when you dug into the

1   facts because what we did is we went on Pacer.  We looked up

2   those cases on the web and we looked at press conferences.  We

3   looked at indictments.  We looked at the pleadings.  And those

4   cases, they were cases that even the ones with probation had

5   dramatically more severe and grave facts in them, whether it be

6   in one case sex with patients for drugs or exchanging drugs or

7   selling drugs for cash to get the prescriptions.  Some of those

8   cases as we have listed in our objections obtained probation.

9          When you analyze the cases that were referenced in the

10  presentence report that dealt with a small prison sentence,

11  even those cases, when you read into the facts, they were not

12  consistent with the Hampers case.  They were much more severe.

13  We have listed those all in our objections.  As the Court has

14  stated, you have reviewed all that and I need not go over those

15  case by case because I am sure the Court is aware of that.

16         The question then becomes under the 3553 guidelines,

17  one of the factors is what is the most effective vehicle of

18  treatment for the defendant.  And here we believe that it is

19  clear, very clear that Dr. Ritvo's recommendations, with the

20  restrictions placed upon Dr. Hampers, with the CPHP, with the

21  continued treatment of Dr. Martz, with the continued counseling

22  with Ms. Anthony, with the CeDAR program that Dr. Ritvo has

23  recommended that there is an excellent chance for an extremely

24  favorable recovery for Dr. Hampers.

25         So under that factor under 3553, again that would

1  support a position of following the defense recommendation for

2  sentencing.

3          In addition, as it relates to public safety, again we

4  make the point that the better that we can -- the system can

5  make Dr. Hampers and have a higher probability of his success

6  to remain on that trajectory for a full recovery, the better it

7  is for him and the better it is for the community, because if

8  his treatment were to be suddenly stopped or interrupted, then

9  obviously there would be a regression and that would not, in

10 our view, be in anyone's interest.

11         *THE DEFENDANT:*  Dr. Ritvo in his letter to the Court

12 in our pleadings, we have stressed some of the statistical data

13 that have come from publications regarding studies of 904

14 physicians with addiction issues.  And if they are under a

15 strict regimented program as we have advocated, then there is

16 even in that article a 78 percent chance for them to remain on

17 a recovery trajectory during the five-year period.  And I

18 believe Dr. Gundersen may have suggested that that number may

19 even be up to 90 percent.

20         So Your Honor, based upon all of this, and I am

21 wrapping it up here because I know the Court has reviewed all

22 of our pleadings, read all of our objections and has reviewed

23 all of the matters that we have submitted, we would

24 respectfully request that the Court depart down by either

25 utilization of the guideline departure under the section cited

1    by the defense and/or the utilization of the 3553 factors to

2    arrive at a sentence which would permit Dr. Hampers to receive

3    the treatment that he has been receiving and so that he would

4    not -- there would be a noncustodial sentence either of

5    probation or some sort of Zone B confinement like a home

6    detention for the appropriate period of time.

7              Thank you very much, Your Honor.

8              THE COURT:  Counsel, thank you.

9              Dr. Hampers, before I impose sentence on you this

10   morning, you first have the legal right and opportunity now, if

11   you choose, to make your own statement to this Court and/or to

12   offer additional information in mitigation of your sentence.

13             First, do you understand that you now have this

14   important right and opportunity?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Second, having that right in mind, do you

17   wish to make any such statement or offer any such information?

18             THE DEFENDANT:  Yes, I do, Your Honor.

19             THE COURT:  Thank you.  Would you and one of your

20   co-counsel at least approach the podium.

21             Dr. Hampers, before I receive your anticipated

22   sentencing statement which we know as allocution, please first

23   raise your right hand now to be sworn by this Court.  Thank

24   you.

25             (Whereupon, the defendant was sworn.):

1            *THE DEFENDANT:*  Yes, I do.

2            *THE COURT:*  Thank you.  Dr. Hampers, now under oath,

3     what is it that you would tell the Court?

4            *THE DEFENDANT:*  Thank you, Your Honor, for this

5     opportunity to address the Court this morning.  For the past 20

6     years I have been honored and fortunate to be able to be

7     allowed to help other people's children and to look after them,

8     and I have done that both directly through as a clinician and

9     as a teacher, but also indirectly as a researcher and an

10    advocate.

11           I stumbled onto the effects of Vicodin about 10 years

12    ago.  I initially used it to manage a genuine physical injury,

13    but I soon found that it made me feel more relaxed and

14    confident in stressful situations either related to work or to

15    family.

16           It wasn't that long after that that I developed a

17    psychological addiction to it as I used it in more and more

18    situations.  And by 2007 I had developed a plain physical

19    addiction to it such that I really couldn't go more than 24 or

20    36 hours without taking another dose, otherwise I would begin

21    to feel the symptoms of physical withdrawal.

22           But despite this growing addiction, I still managed to

23    have quite a bit of professional and career success.  And I

24    tried as hard as I could to keep up normal appearances and to

25    hide this addiction.  I used my work as a cover to compensate

1  for what the addiction was taking away from me and that also

2  allowed me to remain in denial.

3       But as hard as I tried to keep up normal appearances,

4  there were becoming changes in my personality, and I think my

5  co-workers were recognizing that it was becoming more and more

6  difficult to work with me, that I was becoming impatient and

7  irritable and entitled.  So as much as I tried to seem normal

8  and to try to compensate for this, I think these were really

9  ugly changes that were happening to my personality.

10       Everything came crashing down for me in April of 2010.

11  Several things happened at once that month.  The mania that had

12  resulted from the combination of my heavy drug use and my

13  bipolar disease had resulted in a woman getting a restraining

14  order against me at the end of March.  It was in the beginning

15  of April that I was confronted by a pharmacist at Walgreens who

16  confiscated my fake ID and challenged my fraudulent

17  prescription.

18       About that same time colleagues at the Children's

19  Hospital were beginning to ask questions about my behavior.

20  And even physically I had lost 25 pounds and was not even

21  really taking good care of myself.  So it was at that time that

22  I reached out to CPHP and admitted to them that I had a serious

23  drug problem and checked myself into rehab at the Farley Center

24  in Virginia.

25       But even when I arrived in Virginia, I was still in a

1   great deal of denial and using a lot of rationalizations.  I

2   told myself that my behavior was victimless, that it was

3   victimless because I didn't divert or steal any drugs from

4   patients, that it was victimless because I didn't sell or

5   distribute or profit from those prescriptions.

6          And most important to my sense of professional

7   identity, I told myself that I hadn't compromised any patient

8   care.  And I used all these things to convince myself that

9   nobody was really being hurt by my drug taking and by my

10  behavior and that allowed me again to use defense mechanisms

11  and stay in denial.

12         But the truth, of course, that I learned once

13  beginning treatment was that there have been very many victims

14  of my crimes and my behavior.  First and foremost among those

15  has been just the respect for myself as a law-abiding citizen

16  as I had to break the law repeatedly over and over again to get

17  my drug.  And the dishonesty and the manic behavior that I had

18  had resulted in the end of my marriage.  And I am truly -- I

19  truly regret that.  And the publicity around my behavior has

20  embarrassed my ex-wife and just as importantly my children who

21  are 13 and 11.

22         It pains me to think of the harm that I may have done

23  to the Children's Hospital reputation.  Children's Hospital is

24  an amazing institution to which I had dedicated the last 10

25  years to their mission and their programs.  To think that that

1   reputation may have been blemished or tarnished by an

2   association with me is almost too painful to contemplate.  I

3   still believe it is the preeminent and best place for children

4   to get care in the Rocky Mountain region and I will always feel

5   that way.

6          And finally, in my effort to get more and more drugs,

7   I coerced subordinate physicians to write dubious prescriptions

8   for me and then I went and added fraudulently refills to those,

9   and that resulted in them being confronted and investigated by

10  the DEA.  These are people that I had truly considered close

11  friends, and it pains me that they had to go through that

12  experience when it was entirely due to my pressuring them that

13  this happened.  And I abused my authority in that situation all

14  in the pursuit of more drugs to feed my addiction.

15         For nearly the past two years I have spent six months

16  in inpatient rehab, a month in jail, as I was brought back from

17  Virginia to Colorado, and the rest of the time on fairly strict

18  house arrest.  I have been very grateful during that period of

19  time to be allowed to work on my recovery.  And I know that my

20  sons have been grateful for the time with their father, and

21  despite the limitations of house arrest, we have grown closer,

22  certainly closer than we were when I was using drugs heavily

23  and when I was a workaholic at the hospital.  And I believe I

24  have become a better father by incorporating the principles of

25  recovery into my life.

1          But finally and most importantly what I have learned

2     over these last two years of sobriety is that I have a chronic

3     and life threatening disease, and I am grateful today just to

4     be alive.  I am grateful that I got caught.  I am grateful that

5     my kids can grow up with a father through the rest of their

6     childhood and hopefully on into adult hood who is sober and who

7     is present in their lives and that is a gift that this whole

8     journey has allowed me to offer to them.

9          So for me, Your Honor, contrition really involves a

10    hundred percent commitment to doing the things that I need to

11    do to stay in recovery and doing the things I need to do to

12    manage my bipolar disease.

13         I believe that with my continued mental health, I can

14    still apply the 20 years of experience and expertise that I

15    have looking out for children to benefit the community, so I am

16    asking the Court this morning for the opportunity to pursue

17    those goals outside of a prison sentence.

18         Thank you.

19         *THE COURT:*  Thank you, Doctor.

20         You may be seated, gentlemen.

21         Mr. Holloway, does the government wish to be heard on

22    matters material to the imposition of these sentences?

23         *MR. HOLLOWAY:*  Yes, Your Honor.

24         *THE COURT:*  And you may.

25         *MR. HOLLOWAY:*  First, Your Honor, with regard to the

1    guideline analysis for the Court's consideration, the

2    defendant's position for a downward departure relies on a

3    complicated cobbling together of relatively a new guideline

4    provision of 5H1.3 and then takes a rather circuitous route to

5    Application Note 6 referenced by 5C1.1.  I respectfully

6    disagree with that analysis.

7         As I have indicated in my briefing to the Court, I

8    find the defense reasoning unpersuasive.  I think a more simple

9    reading of the guidelines and a more straightforward reading of

10   the guidelines relies upon either 5K2.13 or 5H1.4.  The reason

11   that I referenced 5K2.13 is the defense proffer relies heavily

12   upon concepts of illness and mental disease and so those

13   concepts relate to diminished capacity and diminished capacity

14   is addressed by 5K2.13.

15        That being said, as I have indicated in my analysis,

16   5K2.13 specifically prohibits a downward departure from any

17   mental illness or disease being the basis for a departure if it

18   is induced by the voluntary intoxication of a defendant through

19   their use of drugs or alcohol.  And I believe that that

20   analysis carries the day.

21        Furthermore, the defense proffer and evidence relies

22   heavily on this notion of addiction, and the guideline of 5H1.4

23   clearly addresses concepts of addiction.  What's important is

24   that 5H1.4 doesn't specifically authorize a downward departure

25   under the guidelines solely upon the basis of addiction.

1          When you read the title, at first I was a bit

2    flummoxed because it appeared that 5H1.4 was at odds with

3    5K2.13.  But then when I took the time to sit down and

4    carefully read 5H1.4, they do appear to coexist in that 5H1.4

5    tells the Court that Congress and the Sentencing Commission has

6    found that addiction is correlated with an increase in criminal

7    activity so the Court may consider specific treatment options

8    and plans in fashioning an appropriate sentence.  And so that's

9    why I believe that the defense argument is unpersuasive and

10   that the government's position is the appropriate one in terms

11   of denying their request for a downward departure.

12         The analysis in this particular case is instead

13   appropriately on the factors enumerated under 18, Section

14   3553(a).  I will tell the Court that from the genesis of this

15   case the government's concern has been first and foremost

16   public safety.  And the defendant is before this Court today to

17   be sentenced for his criminal actions.  He is not here because

18   he is an addict.  He is here because he engaged in behavior

19   that was in violation of the law.

20         The analysis in terms of the government's concern in

21   this case again has always been about public safety.  And my

22   concern in looking at the defendant's behavior here has been

23   focused primarily upon what appears to be a history of

24   threatening behavior.  And indeed he has been charged with

25   criminal cases of harassment and my concern at the beginning of

1   this case was his potential for violence.

2        The defense presentation of this DVD is about an hour

3   and a half.  And I reviewed it yet again last night.  And with

4   all due respect to Ms. Gundersen and Ms. Anthony and Dr. Ritvo,

5   I find it wholly unpersuasive.  First of all, their analysis

6   does not address anything in terms of the defendant's strange

7   behavior that, quite frankly, terrified his colleagues at

8   Children's Hospital and his behavior that compromised the

9   safety of other people as well.

10        I am not insensitive to whatever issues Dr. Hampers

11   may be facing in terms of his addiction.  I certainly am not.

12   But in this video it is important to note that Dr. Gundersen

13   and Dr. Anthony or Ms. Anthony appear time and time again to

14   try and emphasize that an addiction makes it so that a person

15   has no choices.  Doris Gundersen at one point even says that

16   the addiction creates a dysfunctional brain which may be

17   similar or create similar tendencies to somebody who is

18   sociopathic.  She goes on to say that the addiction fuels the

19   person so greatly that it controls even basic function such as

20   eating.

21        Then Dr. Gundersen goes on to posit, and it has been

22   detailed in the briefing, she goes on to posit quizzically to

23   me that physicians are able to control their behavior enough

24   such that their patient care and their commitment to patient

25   safety is the last thing that would ever be compromised by

1    that.  I fail to see how that's possible if the addiction

2    controls you so much that you can't eat, but I leave that to

3    the Court to consider in terms of the weight of Ms. Gundersen's

4    observations in terms of determining a sentence in this case.

5           What it says to me is that when you are in the throes

6    of an addiction that is changing your brain in a way that

7    exhibits sociopathic tendencies when you are the head of a

8    pediatric emergency room, that is an inherently dangerous

9    situation.  And that is what troubles me greatly about what it

10   is that we have proffered for consideration before the Court.

11          It's important that that video also has clips about

12   Dr. Hampers' work with the Children's Hospital ER and I do not

13   discount that.  I think that he indeed does deserve credit for

14   positive things that he has done in his career.  The difficulty

15   in that is that on that video there is a clip of him explaining

16   when they move from the ER, that there are some people in that

17   institution or some children in that institution who can't even

18   go to do a CAT scan.  That simply poses too much risk.

19          To look at that video clip in the context then of some

20   of his actions with regard to his colleagues at work in terms

21   of coercing them to write prescriptions for him, in terms of

22   some of the threatening and disturbing behavior, that's

23   something that is quite alarming to me and that is the current

24   concern that I have from the genesis of this case.

25          In terms of the analysis on this video, Doris

1    Gundersen at one point says, the stakes are very high for a

2    physician if the environment for them is punitive, if they go

3    to jail.  My question is what about the stakes for the

4    patients?  Very little is mentioned in terms of public safety

5    in this video and that seems to be the piece that is missing in

6    terms of that video presentation.

7         Doris Gundersen also goes on to explain that

8    physician's health programs were created to protect a valuable

9    resource and that resource being physicians.  And I just don't

10   see that as being persuasive in terms of addiction -- or not

11   addiction, but in terms of deterrence.  Essentially what that

12   video is saying is that if a person is a physician, they are

13   different and that they are a valuable resource and they should

14   be afforded opportunities that are different from others.

15        Her analysis in that video I think is fundamentally

16   flawed.  She posits if you are a physician and you see a

17   colleague go to prison for committing a crime, then it would

18   encourage you to go underground.  I have a different read on

19   that.  I would think that a rational physician, if they saw a

20   colleague fraudulently obtain narcotics and then go to prison

21   for it, it would encourage them not to commit the crime.  I

22   disagree with the defense analysis on that note.

23        The video also goes on to explain that combined with

24   the mental health issues, that this type of a situation is, in

25   the words of Dr. Gundersen, an accidental addiction.  I don't

1   believe in that either.  As defense counsel appropriately

2   points out, there is a point which there is free will and the

3   defendant decided that he was going to obtain Vicodin illegally

4   and he decided to take it.  And in doing so, it triggered a

5   series of events that not only destroyed his own life, but also

6   had tremendous harmful impact to his colleagues, to the

7   community and to his family.

8            I really am not going to pretend that I understand all

9   the nuances of addiction.  That being said, I do not believe

10  that a person's addiction is an excuse for them to commit

11  crimes, and in that analysis I find the video unpersuasive.

12  The point made there in terms of the defense presentation seems

13  to indicate that if you commit a crime in the throes of an

14  addiction, then you technically are not responsible for that,

15  and I don't believe that.  Under Dr. Gundersen's analysis and

16  under Ms. Anthony's analysis, if somebody addicted to

17  methamphetamine were to commit a bank robbery, that wouldn't be

18  their fault.  They are doing it to survive.  It leads down a

19  path that is entirely unacceptable.

20           And quite simply, the defendant should be treated no

21  differently than any other person who sits before this Court

22  having committed this crime.  And, in fact, he will suffer

23  consequences that indeed are greater than the average defendant

24  as it relates to his licensure and his position as a medical

25  profession.  That being said, not to quote the movie Spiderman,

1   but with great power comes great responsibility.  And certainly

2   he will suffer consequences for what he has done, but those

3   consequences are because the public is acting to protect

4   itself.

5          On that note, there is the issue of his licensure and

6   there is a question about that.  In the plea agreement the

7   defendant has agreed to relinquish his medical license and he

8   agrees not to seek reinstatement of that license for the entire

9   period of any supervised release.  That is important to the

10  government in this case.  I was under the understanding that he

11  had already surrendered that license, but it is still active

12  with conditions.

13         That is something that to me is tremendously

14  disconcerting.  I think that his license should be relinquished

15  as part of this judgment and sentence for as long as he is

16  under the sentence of this Court, and I think that the

17  authority to do so only exists until the end of the period of

18  supervised release.

19         In terms of the risk to the public in this case, my

20  concern about his behavior has been continued in terms of the

21  criminal case that he suffered while he was on conditions of

22  pretrial release.  I will tell the Court that at the outset of

23  this case, I believed that the appropriate place for the

24  defendant was detention and the government did not prevail on

25  that motion.  And when he incurred this criminal violation, I

1    will say that I reflect on this as a substantial risk that I

2    agreed to.  He was arrested by the police on a harassment

3    charge and my understanding is that is still pending.

4          I agreed to restrictive conditions of pretrial release

5    after that that further restricted him to strict house arrest.

6    I did that in an effort to be fair, not to the defendant, but

7    to his family.

8          In terms of my analysis, I don't think that the

9    addiction analysis is the most persuasive analysis in terms of

10   sentencing before this Court.  I believe that the defendant

11   cares about his children, and I took the risk of not seeking

12   revocation of bond so he could have some more time to work on

13   that relationship with his children as it was presented to me

14   through his attorneys.  And if the Court has inquiry of that

15   decision, I am happy to answer that.

16         I will tell the Court that I reflect on this and view

17   it as a substantial risk.  And that is why I believe when you

18   look at this case, the defendant's motion for a downward

19   departure should be denied.  And also when you look at the

20   totality of circumstances in this case, a sentence within the

21   guideline range is what is appropriate.

22         Incarceration is appropriate in this case for a number

23   of reasons.  First of all, again I go back to the safety of the

24   community.  The defense analysis seems to believe that if the

25   defendant were sentenced to a period of incarceration, he would

 1    receive no treatment or everything would absolutely stop.

 2    That's not the case.  And while the Bureau of Prisons treatment

 3    capabilities may be less than what this defendant is able to

 4    afford and provide for himself, treatment would not simply stop

 5    if he were imposed to a period of incarceration.

 6         You know, the question isn't necessarily focused on

 7    Lou Hampers.  The defense analysis, all the focus has been on

 8    what has been the best for Lou Hampers.  I disagree with that

 9    analysis.  I think the analysis is what is best for society and

10    that includes Lou Hampers within it.  There are treatment

11    options in prison.

12         And in terms of society, the message sent by that DVD

13    I think needs to be refuted.  Physicians or anyone else for

14    that matter are not different than anybody else in the eyes of

15    the law.  There is no difference.  And the guidelines endeavor

16    to reach that result.  And we have carved out all these

17    different exceptions to try and address the fundamental intent

18    of the guidelines and uniformity and consistency among

19    defendants with specific factual circumstances of each case.

20         Now, in the defendant's argument he compares the

21    defendant to other people who have been convicted of similar

22    crimes, far lesser counts.  You know, each case indeed is

23    unique and counsel encourages us to dig down and look at the

24    facts of each individual case, and I think that that is

25    appropriate to do.

1            And in those other cases my question is this.  When

2    you begin looking at the specific factual analysis of those

3    other cases in reflection with what this defendant did, you

4    know, did those other defendants get charged with additional

5    criminal offenses while on supervision?  Were there allegations

6    of threatening behavior at their workplace?

7            Did those defendants use the identity of his escort's

8    children to obtain drugs?  Did those defendants manufacture

9    four different identities in order to obtain those drugs?  To

10   say that this case is unremarkable in the number of pills is

11   troubling to me.  This case spans three years, over 20

12   pharmacies, four aliases for which the defendant manufactured

13   false IDs, used the identity of a woman that he was paying for

14   sex, and he used the identity of her children to obtain over

15   19,000 pills.  If that is common as what is posited by Doris

16   Gundersen and Ms. Anthony, that's troubling to me.  If that is

17   common among physicians, I have some serious, serious questions

18   about the role and the functioning of the Colorado State

19   Medical Board.

20           On that point, Ms. Gundersen's statement or

21   Dr. Gundersen's statement and proffered evidence is perplexing

22   to me because I am not exactly sure what her status is.  The

23   Court received a filing from the Attorney General's Office

24   indicating that she is a contractor with the State of Colorado

25   and that she is contracted with the Colorado State Medical

1 | Board.

2 |         To have her advocating for a noncustodial sentence on

3 | behalf of this defendant seems to be a bit perplexing to me.

4 | And, quite frankly, her statements throughout this video in

5 | this matter raise a tremendous amount of concern in my mind

6 | about the Colorado State Medical Board's commitment to protect

7 | the public.  Again, ideas of accidental addiction and focusing

8 | on the stakes of a physician rather than public protection is

9 | something that someone associated with the medical board I

10 | don't think would be doing.

11 |         All that being said, I recognize the contributions

12 | that Dr. Hampers has made, and it makes a determination about

13 | how this goes difficult.  And again, the most important

14 | calculus in my mind isn't necessarily Dr. Hampers.  The most

15 | important calculus in my mind is the impact his criminal acts

16 | have had on those around him, both his colleagues, his family

17 | and his children.  Those are the things that I think are the

18 | important considerations.

19 |         I think that the addiction and mental health dual

20 | diagnosis is unpersuasive because it seems to cobble together a

21 | whole bunch of law and facts in a way that avoids a

22 | straightforward hard look at what it is the defendant did and

23 | what he should be held responsible for.

24 |         One thing that I did find quite compelling in that

25 | video was Dr. Anthony's observation at the end when she said,

 1    it was asked of me what I would want to hear.  What I would

 2    want to hear is if that person is truly contrite, if they are

 3    truly sorry.  And in looking at Dr. Hampers' allocution on that

 4    video and looking at his allocution before the Court here

 5    today, I don't know what exactly it is that I have heard.  I

 6    mean, he has taken responsibility for what it is that he has

 7    done, but I haven't heard him say that was my fault.  I have

 8    heard him say that's my fault because of an addiction.  I have

 9    heard him say in terms of the May incident where he was charged

10    with the harassment case, that was because his medications were

11    off.

12         His behavior was described by his colleagues as

13    becoming impatient, irritable and entitled.  It goes beyond

14    that as reflected in the pretrial services report.  It's not

15    just irritable and impatient and entitled.  It was criminal.

16    So when I look at that, I have legitimate questions about

17    whether or not the addiction analysis warrants a sentence that

18    deviates from the guideline range and in my mind it does not.

19         Again, I recognize his achievements and his

20    contributions and I don't think they are insignificant, but I

21    do believe that his license to practice medicine should be

22    impeded for as long as appropriate.  I do believe that

23    balancing the good things he has done with the crimes that he

24    has committed leads me to believe that a period of imprisonment

25    for a term of 12 months, which is the bottom of the guideline

1   range, is appropriate.

2       I also believe that Ms. Ricca's analysis in the report

3   is well-founded, is accurate, is thorough.  And I also believe

4   that an 18-month sentence as requested by probation is

5   certainly not inappropriate, but I am attempting to try and

6   balance those issues and I come out at 12 months, Your Honor.

7   That's where I do.  And unless the Court has any further

8   inquiry of me, I am done.

9       *THE COURT:*  I do not.  Thank you, counsel.

10      *MR. HOLLOWAY:*  Thank you, Your Honor.

11      *MR. GILLEN:*  Your Honor, does the Court entertain

12  rebuttal argument from counsel?

13      *THE COURT:*  I do not.

14      Very well.  The Court will be in recess for 10 minutes

15  after which the Court will impose sentence on Dr. Hampers.

16      Madam clerk, please declare the recess of the court.

17   (Recess at 11:06 a.m.)

18   (Reconvened at 11:22 a.m.)

19      *THE COURT:*  We convene in the record now in open court

20  to receive the sentences of the Court.

21      In considering, fashioning and imposing condigned and

22  constitutional sentences, I have considered all relevant

23  matters of fact and law including the following:  The plea

24  agreement of these very parties, including their written

25  stipulation of facts relative to sentencing; the nature and

1   circumstances of these drug-related offenses focusing, as I

2   must, on their real conduct; the history and characteristics of

3   Dr. Hampers; the sentences permitted or authorized by law

4   cataloged conveniently at 18 U.S.C. 3551; the presentence

5   report, its addendum and concomitant Exhibits A through F; the

6   basic purposes of criminal punishment as declared by Congress

7   in the Sentencing Reform Act of 1984 focusing on deterrence,

8   incapacitation, just punishment and rehabilitation; the

9   purposes and goals of sentencing as prescribed by Congress in

10  the much more familiar 18 U.S.C. 3553(a)(2); all factors that I

11  must consider as a matter of law at 18 U.S.C. 3562(a), 3582(a)

12  and 3553(a)(1) through (7); the constitutional and relevant

13  provisions of the now advisory United States Sentencing

14  Guidelines that apply to these offenses, this offender and all

15  relevant conduct; the kind of sentence and sentencing range

16  established under those advisory sentencing guidelines for this

17  applicable category of offense committed by this applicable

18  category of defendant, a reference to Section 3553(a)(4); the

19  need always to avoid unwarranted sentencing disparities; the

20  need when apposite to restitute victims; all pertinent policy

21  statements of the United States Sentencing Commission; the need

22  to impose sentences that satisfy the principles, requirements

23  and needs of Section 3553(a)(2); the advancement of the seminal

24  congressional goals of honesty, uniformity and proportionality

25  in sentencing; the principal requirement codified at 3553(a) to

1   impose sentences that are sufficient but not greater than

2   necessary to satisfy the sentencing statute; the propriety or

3   necessity of imposing concurrent or consecutive sentences after

4   considering for each count of conviction the combined

5   provisions of 18 U.S.C. 3584(a) and (b) and the more familiar

6   3553(a)(1) through (7); the position of the government, the

7   defense, including defense counsel and Dr. Hampers himself and,

8   of course, the probation department.

9         The following papers:  Defendant's objections to the

10  presentence report, Docket 130 filed January 9, 2012,

11  defendant's motion for downward departure or variance pursuant

12  to 18 U.S.C. 3553, Document 134 filed January 17, 2012, the

13  government's response to the defendant's motion, Document 144

14  filed February 6, 2012, the defendant's reply to that

15  government's response Document 147 filed February 13, 2012, the

16  correspondence dated January 17, 2012 from Mr. Tegtmeier to the

17  Court transmitting a letter from the defendant, which I read, a

18  DVD labeled Hampers Sentencing DVD, which I viewed, and a

19  second DVD containing the defendant's narrative to the Court,

20  which DVD I also viewed, and the government's motion to dismiss

21  other counts and charges, Document 156 filed March 22, 2012.

22        All relevant information concerning the background,

23  character and conduct of Dr. Hampers exercising my discretion

24  under 18 U.S.C. 3661; and lastly, but certainly importantly,

25  all evidence presented, reasons stated, arguments advanced and

1  authorities cited by all parties in interest either in their

2  sentencing papers or during this sentencing hearing.

3          Having engaged in that comprehensive sentencing

4  analysis, I now make the following sentencing statement which I

5  must under 18 U.S.C. 3553(c).  Therefore, on this record

6  considered as a whole, I now enter the following findings of

7  fact, conclusions of law, judgments of conviction, sentences

8  and orders.

9          Commencing with my findings and conclusions:  That

10  initially, but importantly I approve, adopt and incorporate in

11  my sentencing statement the myriad matters which I have

12  considered carefully and noted just now on the record.

13  Dr. Hampers filed objections to the presentence report.  His

14  objections are stated in Document 130 filed January 9, 2012.

15  None of his objections affects the calculation of the advisory

16  sentencing guideline ranges.  I have considered his position

17  and the clarifying information submitted in those so-called

18  objections.  None of the objections requires further formal

19  ruling.

20          That therefore, as I may under Federal Rules of

21  Criminal Procedure 32(i)(3)(A), I accept the presentence report

22  as supplemented by Dr. Hampers, including the advisory

23  sentencing guideline applications and calculations as an

24  integral part of my findings of fact.

25          That on July 13, 2011, I conducted a plea hearing

1   where Dr. Hampers pursuant to his plea agreement voluntarily,

2   knowingly, intelligently and intentionally entered

3   unconditional pleas of guilty to Counts 2, 3, 62, 63, 144, 145,

4   188, 189, 311, 312, 397, 398, 491 and 492 of the indictment,

5   each count charging the Class E felony of obtaining and

6   acquiring a controlled substance by fraud and deceit in

7   violation of 21 U.S.C. 843(a)(3) and (d)(1); that for advisory

8   purposes only the November 2011 edition of the United States

9   Sentencing Commission Guidelines Manual applies.  Thus, I have

10  consulted and used that edition as the starting point and the

11  initial benchmark for my own sentencing analysis.

12          However, I have not presumed that the guideline range

13  is reasonable.  That identification, consideration and

14  application of all relevant provisions of the advisory United

15  States Sentencing Guidelines to these offenses, this offender

16  and all relevant conduct produce as a total adjusted advisory

17  offense level of 13 and an advisory criminal history category

18  of one predicated on the imposition of zero criminal history

19  points; that in turn the advisory sentencing guideline ranges

20  are as follows:  Imprisonment as to each and all of the 14

21  counts of conviction, imprisonment 12 to 18 months; supervised

22  release, one year; fines ranging from $3,000 to $30,000.

23          I will next address sentence departures.  As I must, I

24  distinguish between a departure and a variance.  A departure

25  occurs when a court reaches a sentence above or below the

1    recommended guidelines range through application of Chapters 4

2    or 5 of the sentencing guidelines.  I cite to United States v.

3    Atencio, 476 F.3d 1099 at Page 1101, Note 1, (10th Cir. 2007).

4    A variance occurs when a court enhances or detracts from the

5    recommended range through application of Section 3553(a)

6    factors, citing also to Atencio and United States v. Sells,

7    541 F.3d 1227 at Page 1238, Note 2, (10th Cir. 2008).

8            Dr. Hampers requests that I depart downward.  His

9    request for a downward departure is stated and argued in his

10   motion for a downward departure which I have previously

11   identified as Document No. 134.  Dr. Hampers requests that I

12   depart downward under Guideline Section 5H1.3, mental and

13   emotional conditions, and Guideline Section 5H1.4, physical

14   condition, including drug or alcohol dependence or abuse.

15           I recognize and acknowledge that I have jurisdiction

16   and authority to depart downward, but I decline to exercise my

17   discretion to depart downward.

18           Having considered all of the matters I enumerated

19   earlier, having considered and resolved to the limited extent

20   necessary the objections of the defense, having considered and

21   applied all relevant advisory sentencing guidelines to these

22   offenses, this offender and all relevant conduct and having

23   declined to exercise my acknowledged discretion to depart

24   downward, I now consider the discrete sentencing factors and

25   needs at 18 U.S.C. 3553(a)(1) through (7) and Dr. Hampers'

1    request for a variance, also as stated and argued in his

2    motion, Document No. 134.  And I make an individualized

3    assessment on the facts presented in the process.

4         Concerning the nature and circumstances of these

5    drug-related felony offenses, I find and conclude as follows:

6    The nature of and manner in which the offenses were committed

7    make them serious.  These crimes involve substantial quantities

8    of dangerous and addictive controlled substances including

9    Vicodin, Ambien, Valium, Xanax and Provigil, if I am

10   pronouncing that medication correctly.  The charged crimes and

11   the pattern of criminal conduct occurred over a substantial

12   period of time, roughly from December 16, 2008 to March 29,

13   2010.  In fact, using an alias Dr. Hampers began writing

14   prescriptions for Vicodin in 2004.

15        Dr. Hampers did not just wake up one morning and

16   conclude that what he was doing was wrong and detrimental to

17   his family, patients, colleagues and hospital.  Instead, like

18   most others that appear before this Court in these

19   circumstances, he got caught.  Dr. Hampers abused the sacred

20   prerogative reserved rightly to physicians to prescribe

21   medications to treat and heal the sick.  Dr. Hampers acquired

22   these controlled substances for his personal use by various

23   means of artifice, fraud and deceit.  He did not hesitate to

24   exploit others, including friends, associates, subordinates,

25   colleagues, patients, and even relative strangers.

1          However, in mitigation, there are no victims, at least

2     as defined legally.  His criminal conduct was solely for the

3     purpose of satisfying his own morbid addiction and does not

4     involve the sale or distribution of controlled substances to

5     others.  Beyond supposition there is no evidence that

6     Dr. Hampers' criminal conduct adversely affected patient care

7     or caused lasting, let alone irreparable harm to the hospital,

8     his colleagues or his family.

9          Concerning the history and characteristics of

10    Dr. Hampers who I have treated as the unique being he is, I

11    find and conclude as follows:  He is 46 years old, closer to 46

12    and a half.  He and his brother were raised in an intact

13    two-parent loving family.  He is extremely well educated.  He

14    has a college degree and he has both an M.D. and M.B.A.  He has

15    two children, both sons ages 13 and 11.

16         His contributions to society and the medical

17    profession are indeed substantial.  He has had an extraordinary

18    life of professional accomplishments and community outreach and

19    these achievements and accomplishments are detailed in the

20    letter of October 17, 2011 of Dr. Sheila Balkan, if I am

21    pronouncing that correctly, and of the video presentation of

22    character witnesses literally throughout the country.  He has

23    no criminal history.

24         He was arrested on September 7, 2010, served 27 days

25    in pretrial detention, that's our euphemism for jail, and was

1    released on a cash bond on October 4, 2010 subsequent to which

2    Dr. Hampers has been under strict pretrial supervision and

3    subject to both onerous and arduous conditions of bail, and

4    thus Dr. Hampers has been under intense judicial scrutiny for

5    just less than the lasts 18 months.

6         He has a dual diagnosis, a mental illness and a drug

7    dependence.  He has significant reticulated and ongoing

8    post-offense rehabilitation.  With continued intense treatment

9    and therapy, his prognosis is excellent.  His potential for

10   relapse is extremely low and his risk to the community is

11   effectively extenuated, if not eliminated all together.  Today

12   to his credit he presents sober, as he has been for the last

13   number of months.

14        His diagnosed mental illness and personality disorder

15   played a causative role in the commission, continuation and

16   exacerbation of these serious offenses.  However, although the

17   skewed mentation of Dr. Hampers may help to explain these

18   offenses, it does not excuse them.

19        Dr. Hampers, like the rest of us, is personally

20   responsible and accountable for his conduct and his

21   consequences however tragic and ruinous.  Despite the sentence

22   imposed today, Dr. Hampers has already suffered the enigma

23   associated with his criminal conduct.  He has for now lost his

24   good name and tarnished his reputation and perhaps that of the

25   Children's Hospital.

1          He has lost his license to practice medicine.  He has

2     lost a prestigious position at a nationally acclaimed hospital.

3     He is no longer a revered clinician, teacher or researcher.

4     His marriage is irretrievably broken.  Dr. Hampers, despite the

5     sentence I impose, leaves the courtroom today branded forever

6     as a convicted felon, a shameful status that in one way or

7     another will haunt and burden him for the rest of his life.

8          The sentencing statute provides the obvious.  The

9     sentence imposed must reflect the seriousness of these

10     offenses, provide for just punishment, promote respect for the

11     law, protect the public from further crimes of Dr. Hampers,

12     provide adequate deterrence to him and others similarly

13     situated, provide Dr. Hampers with an opportunity for

14     rehabilitation, and, of course, avoid unwarranted sentencing

15     disparities.

16          Where an insidious mental illness is a substantial

17     contributor to an insidious drug addiction that

18     self-perpetuates and is exacerbated by the mental illness, then

19     the synergistic effects are those displayed by Dr. Hampers.

20     They are ruinous.  And such circumstances, of course, cry out

21     for an intense and reticulated treatment because treatment is

22     what will rehabilitate Dr. Hampers and thus protect the public

23     from further crimes committed by him and provide adequate

24     deterrence to him.

25          But having considered all of the matters I enumerated

 1   earlier, I conclude ultimately that a downward variance is

 2   warranted, and thus I will vary downward to impose a sentence

 3   to supervised probation for a term of five years, a lengthy

 4   sentence to probation coupled with strict requirements for

 5   scrutinized treatment concatenated with a substantial fine will

 6   provide just punishment that effectively reflects and addresses

 7   the seriousness of these drug-related offenses.

 8        Protection of the public here deserves long-term

 9   judicial supervision, yet the irony is that probation, not

10   incarceration, provides the best legal vehicle to provide such

11   long-term supervision.  A sentence to probation for five years

12   subjects Dr. Hampers to judicial supervision that is much

13   longer than a sentence to imprisonment even at the top of the

14   advisory guideline range followed by one year of supervised

15   release.

16        Such a probationary sentence will promote respect for

17   the law except for those who seek retribution without reason.

18   There will be some who conclude erroneously that a

19   well-educated, affluent professional should be sentenced more

20   harshly, but such professionals, even physicians, are not

21   immune from the ruinous redounds of mental illness and

22   addiction.  Based on the sentences imposed in arguably similar

23   cases, a sentence to probation will certainly not constitute or

24   produce an unwarranted sentence in this case.

25        And I appreciate all of the research, the benefits of

1    which I was provided for a comparative sentencing analysis, but

2    let me make it clear the law in the 10th Circuit is to be

3    disparate -- well, to conduct a sentencing comparison, I must

4    focus on comparable offense levels and criminal history

5    categories.  Virtually none of that information was provided to

6    the Court.  All things considered, a probationary sentence, not

7    a custodial sentence, is the sentence that is sufficient but

8    not greater than necessary to satisfy the sentencing statute.

9         But after considering the factors at 18 U.S.C. 3013

10   and 3572(a) and Guideline Section 5E1.2, I conclude that

11   Dr. Hampers is financially able to pay a fine and that

12   therefore pursuant to Guideline Section 5E1.2(a) I will impose

13   a fine.  As required by 18 U.S.C. 3572(a) and Guideline Section

14   5E1.2(d), in determining the amount of the fine, I have

15   considered carefully the factors at 3572(a)(1) through (8) and

16   Guideline Section 5E1.2(d)(1) through (8) and have insured that

17   the fine taken together with all other sanctions imposed is

18   punitive.

19        I conclude ultimately that a fine of $30,000 should be

20   imposed, which fine is the maximum fine in the guideline range

21   for fines at Guideline Section 5E1.2(c)(3).  That restitution

22   is not a legal issue for the Court to marshal.

23        Therefore, it is ordered as follows:  That the plea

24   agreement of these parties as stated and preserved in the

25   originals of Court's Exhibits 1 and 2 is formally approved;

1    that the government's motion to dismiss the remaining counts,

2    Document 156 filed March 22, 2012, is granted; that the

3    defendant's motion for downward departure or variance pursuant

4    to 18 U.S.C. 3553, Document 134, filed January 17, 2012 is

5    denied insofar as it requests a downward departure and is

6    granted insofar as it requests a downward variance consistent

7    with the foregoing findings and conclusions and the following

8    orders:

9         The judgment of conviction shall now enter on Counts

10   2, 3, 62, 63, 144, 145, 188, 189, 311, 312, 397, 398, 491 and

11   492 of the indictment.  That pursuant to the Sentencing Reform

12   Act of 1984 and the provisions of 18 U.S.C. 3553(a), 3561, 3562

13   and 3621(a), it is the judgment and sentence of this Court that

14   the Defendant, Louis Constantine Hampers, is sentenced to

15   supervised probation for a term of five years on each count of

16   conviction for a total sentence of five years during which

17   Dr. Hampers shall be subject to the jurisdiction of this Court

18   and its probation department.

19        That while on supervised probation, Dr. Hampers shall

20   comply with the following conditions of supervised probation:

21        First, he shall comply with all mandatory conditions

22   prescribed by law at 18 U.S.C. 3563(a) and Guideline Section

23   5B1.3(a).

24        Second, he shall comply with all standard conditions

25   of probation which are imposed by this Court in virtually all

1    such cases and now including this one; and

2           Third, he shall comply with the following

3    discretionary or special conditions:

4           Dr. Hampers, of course, shall not violate federal,

5    state or local law.  He shall not possess or use illegally

6    controlled substances.  He shall not possess or use any

7    firearm, destructive device or dangerous weapon as defined by

8    federal law at 18 U.S.C. 921.

9           He shall cooperate fully in the collection of a sample

10   of his DNA.

11          As directed by his probation officer, he shall submit

12   to one drug test within 15 days of the formal entry of judgment

13   of conviction in this case and thereafter to at least two

14   periodic tests for the use of a controlled substance as

15   determined by the Court.

16          Dr. Hampers shall participate at his own expense in

17   the extensive treatment program detailed by Dr. Jonathan Ritvo,

18   a clinical professor of psychiatry with the University of

19   Colorado School of Medicine in his letter of November 7, 2011,

20   which is incorporated by this reference, and as rehearsed in

21   the defendant's motion for a sentence variance, Document

22   No. 134 at Pages 2 and 3 in Paragraphs 1 through 6.

23          Dr. Hampers shall abstain from the use of alcohol and

24   all other intoxicants during the course of any such treatment,

25   therapy, counseling, testing or education.  To ensure

1    continuity of treatment, the Probation Department is authorized

2    to release all records concerning Dr. Hampers, including the

3    presentence report, to any person or entity responsible for or

4    involved in his treatment, therapy, counseling, testing or

5    education.

6         Dr. Hampers shall relinquish and not seek

7    reinstatement of any license to practice medicine in Colorado

8    or any other state and/or district in the United States.

9         Dr. Hampers shall relinquish and not seek

10   reinstatement of any privileges to prescribe controlled

11   substances.

12        Dr. Hampers shall not initiate any contact or

13   communication with the following:  Children's Hospital and its

14   employees and staff and DS a/k/a DM and/or her child.

15        Dr. Hampers shall disclose the fact of his conviction

16   in this case to any physician, medical practitioner or mental

17   health professional involved in or responsible for his mental

18   health or substance abuse treatment or therapy.

19        And lastly, Dr. Hampers is placed on home detention

20   for a period of six months during which he shall be in his

21   place of residence at all times except for approved absences

22   for gainful employment, religious services, medical, mental

23   health or substance abuse care, treatment, counseling, testing

24   or education, educational or training programs, and such other

25   times and activities as may be authorized specifically by his

1    probation officer.

2           Home detention for Dr. Hampers will be enforced by

3    electronic monitoring as directed by his probation officer.

4    Dr. Hampers at his own expense shall make all arrangements

5    necessary to facilitate such electronic monitoring and

6    Dr. Hampers shall cooperate fully with the probation officer to

7    facilitate home detention.

8           Pursuant to 18 U.S.C. 3571 and Guideline Section

9    5E1.2(a) and (c)(3), Dr. Hampers shall pay a fine of $30,000

10   which pursuant to 18 U.S.C. 3572(d)(1) shall be due and payable

11   forthwith.

12          Dr. Hampers shall pay forthwith a special victim's

13   fund assessment of $1,400.

14          And that immediately following this hearing,

15   Dr. Hampers and his counsel shall confer with Probation Officer

16   Kirk Thoene who is in open court to schedule an appointment to

17   read, review and sign the required conditions of probation.

18          Dr. Hampers, do you understand the sentence that I

19   have imposed?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  Do you for now at least in a general way

22   understand the mandatory standard and special conditions of

23   your supervised probation?

24          THE DEFENDANT:  Yes, I do.

25          THE COURT:  Very well.  You may be seated.  Thank you.

1          Gentlemen for the defense, I am keenly aware of my

2     duty now under Rule 32(j)(1) to advise Dr. Hampers of his right

3     to appeal this sentence to a higher court.  I inquire, does he

4     demand or waive such formal advisement now by the Court,

5     counsel?

6          *MR. GILLEN:*  We waive formal advisement, Your Honor.

7          *THE COURT:*  Very well.

8          Is there further business to come before the Court by

9     the government?

10         *MR. HOLLOWAY:*  No, Your Honor.  Thank you.

11         *THE COURT:*  In fact, let me give you this opportunity,

12    Mr. Holloway, to state and thus preserve any objections to the

13    sentence imposed by the Court.  Are there any such objections?

14         *MR. HOLLOWAY:*  No, Your Honor.

15         *THE COURT:*  Are there any such objections on behalf of

16    Dr. Hampers?

17         *MR. GILLEN:*  No, Your Honor.

18         *THE COURT:*  Is there further business on behalf of

19    Dr. Hampers?

20         *MR. GILLEN:*  No, Your Honor.

21         *THE COURT:*  Please close the record in this case.

22    Madam clerk, please declare the recess of the court.

23        (Recess at 11:54 a.m.)

24

25

1                        REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.   Dated

4     at Denver, Colorado, this 9th day of May, 2012.

5

6                              S/Janet M. Coppock____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25